# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

JANE DOE,                                              )
    Plaintiff,                     )
                                   )
v.                                                     )   Civil Action No. _____
                                   )
THE CONNOR GROUP LLC; HALEY     )
WICKSTROM; PEGGY H.; GRETA BIESEL;  )
BRYANT F.; and YARDI SYSTEMS, LLC,  )
individually and d/b/a RENTCAFE    )
                                   )
    Defendants.                    )

---

## COMPLAINT AND JURY DEMAND

Plaintiff Jane Doe brings this federal civil action against Defendants The Connor Group LLC, Haley Wickstrom, Peggy H., Greta Biesel, Bryant F., and Yardi Systems, LLC, individually and d/b/a RentCafe, and states as follows:

### 1. NATURE OF THE ACTION

1. This is a federal civil rights, fair housing, premises liability, negligence, retaliation, intimidation, and preservation-of-evidence action arising from Defendants' conduct toward Plaintiff, a Black disabled tenant/resident at the apartment community known as Outlook DTC in Denver, Colorado.

2. Plaintiff brings federal claims under the Fair Housing Act, including 42 U.S.C. § 3604(b), 42 U.S.C. § 3604(f), 42 U.S.C. § 3617, and 42 U.S.C. § 3613.

3. Plaintiff brings related Colorado law claims under this Court's supplemental jurisdiction, including premises liability, negligence, negligent supervision, failure to intervene, false statements, civil conspiracy, concerted action, retaliatory surveillance, intimidation, and preservation of evidence.

4. Defendant The Connor Group LLC is the primary corporate defendant. The individual defendants are named because each personally participated in separate conduct that contributed to the retaliation, interference, intimidation, unsafe premises conditions, false statements, surveillance, or denial of housing-related services directed at Plaintiff.

5. Plaintiff does not sue the individual defendants merely because they were employees. Plaintiff sues them because each acted personally and directly in the events described in this Complaint.

6. Plaintiff demands a trial by jury.

7. Plaintiff seeks damages in the amount of $20,000,000.00, or such amount as the jury determines is supported by the evidence, together with compensatory damages, punitive damages where authorized, statutory damages, costs, interest, attorney fees where authorized, injunctive relief, preservation orders, and all other relief allowed by law.

1

## 2. JURISDICTION AND VENUE

8. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff brings claims under the federal Fair Housing Act.

9. This Court has jurisdiction over Plaintiff's Fair Housing Act claims under 42 U.S.C. § 3613.

10. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's related Colorado law claims because those claims arise from the same facts, transactions, occurrences, housing relationship, property, employee conduct, and retaliatory pattern described in this Complaint.

11. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Colorado, including at Outlook DTC in Denver, Colorado.

12. Defendant The Connor Group LLC conducted business in Colorado and operated, managed, controlled, leased, billed, collected, and/or supervised housing-related activity at Outlook DTC.

13. The individual defendants worked at Outlook DTC and engaged in the conduct described in this Complaint in Colorado.

14. Defendant Yardi Systems, LLC operated or provided the RentCafe platform used in connection with Plaintiff's resident account, resident portal, payment history, ledger records, and housing-related account access.

## 3. PARTIES

15. Plaintiff Jane Doe is a Black woman and a disabled tenant/resident who resided at Outlook DTC in Denver, Colorado.

16. Plaintiff proceeds under the pseudonym Jane Doe because public disclosure of Plaintiff's legal name, address, location, and identifying information creates a serious safety risk. Plaintiff will provide her true identity to the Court and Defendants through a sealed or confidential procedure as directed by the Court.

17. Defendant The Connor Group LLC is the primary corporate defendant and is responsible for corporate policies, practices, supervision, training, property operations, leasing practices, resident services, employee conduct, billing systems, portal access, and fair housing compliance at Outlook DTC.

18. Defendant Haley Wickstrom is the property manager at Outlook DTC.

19. Defendant Peggy H. is a sales associate at Outlook DTC.

20. Defendant Greta Biesel is a sales associate at Outlook DTC.

21. Defendant Bryant F. is a maintenance technician at Outlook DTC.

22. Defendant Yardi Systems, LLC is a software and property-management technology company.

23. Defendant Yardi Systems, LLC d/b/a RentCafe operated, controlled, maintained, or provided the RentCafe resident portal/payment platform used by The Connor Group LLC and Outlook DTC for resident payments, ledgers, account access, payment history, billing records, portal access, and resident-service functions.

24. At all relevant times, Defendants Haley Wickstrom, Peggy H., Greta Biesel, and Bryant F. acted as employees, agents, representatives, or persons acting with actual or apparent authority on behalf of The Connor Group LLC and Outlook DTC.

25. The Connor Group LLC is liable for its own conduct and for the acts and omissions of its employees, agents, representatives, and property staff acting within the scope of their housing-related duties.

## 4. GENERAL FACTUAL BACKGROUND

26. Plaintiff complained about illegal fees, unlawful billing practices, portal lockout, and housing-related misconduct at Outlook DTC.

27. Plaintiff is a disabled tenant and provided disability-related documentation to The Connor Group LLC in connection with her housing dispute.

28. Plaintiff also contacted HUD FHEO regarding fair housing concerns involving The Connor Group LLC and Outlook DTC.

29. After Plaintiff challenged illegal charges and housing practices, Defendants engaged in a pattern of retaliation, intimidation, surveillance, false narratives, denial of housing-related services, and interference with Plaintiff's ability to safely live at Outlook DTC.

30. The conduct described in this Complaint is separate from Plaintiff's state-court claims concerning unauthorized fees and deceptive billing. The federal claims focus on discrimination, retaliation, intimidation, employee misconduct, denial of equal housing services, safety, surveillance, and interference with Plaintiff's fair housing rights.

## 5. THE CONNOR GROUP LLC'S CORPORATE ROLE

31. The Connor Group LLC operated, managed, controlled, leased, supervised, and maintained Outlook DTC.

32. The Connor Group LLC held itself out as an Equal Housing Opportunity housing provider.

33. The Connor Group LLC was responsible for ensuring that employees and agents complied with fair housing laws, disability protections, anti-retaliation requirements, resident safety obligations, and property-management standards.

34. The Connor Group LLC failed to prevent, correct, supervise, or stop retaliatory and discriminatory conduct directed at Plaintiff.

35. The Connor Group LLC is liable for its own policies, practices, failures to supervise, failures to train, failure to protect Plaintiff, ratification of employee conduct, and the acts of its agents and employees performed within the scope of their housing-related duties.

36. The Connor Group LLC and its employees created a hostile, retaliatory, and dangerous housing environment after Plaintiff complained about unlawful fees and housing-related misconduct.

37. The Connor Group LLC used or allowed staff to escalate conflict, threaten police involvement, deny portal access, surveil Plaintiff's unit, provide false narratives to law enforcement, and interfere with Plaintiff's safe access to housing services.

## 6. HALEY WICKSTROM'S CONDUCT

38. Defendant Haley Wickstrom is the property manager at Outlook DTC.

39. Haley Wickstrom acted as The Connor Group LLC's on-site managerial agent and carried out the company's response to Plaintiff's complaints.

40. Haley Wickstrom served, posted, or caused to be served or posted demands and notices at Plaintiff's door while Plaintiff's resident portal remained locked.

41. Plaintiff's resident portal was locked for more than 35 days, including during periods when no active eviction case was pending.

42. By keeping Plaintiff's portal locked while posting demands at Plaintiff's door, The Connor Group LLC and Haley Wickstrom created a paper trail against Plaintiff while preventing Plaintiff from seeing her account, ledger, payments, credits, removals, changes, and disputed charges.

43. Haley Wickstrom pressed Plaintiff's Ring doorbell, returned to Plaintiff's door, posted documents, taped documents, photographed the door, and created documentation at Plaintiff's unit while Plaintiff's portal remained locked.

44. These actions were part of a coordinated effort to portray Plaintiff as noncompliant or unstable when Plaintiff was complaining about unlawful charges and missing lease documents.

45. During interactions with Plaintiff, Haley Wickstrom represented that the disputed charges were legal and that Defendant had authority to charge them.

46. Haley Wickstrom made those statements despite Plaintiff's position that she had no valid Unit 214 lease authorizing the charges and despite billing records showing inconsistent technology, utility, common gas, common electric, and RBS charges.

47. Haley Wickstrom's statements were used to dismiss, intimidate, and undermine Plaintiff's complaints about unlawful billing.

## 7. HALEY WICKSTROM AND THE JULY 2 LOBBY INCIDENT

48. On July 2, 2026, Plaintiff attempted to speak about unlawful charges in the Outlook DTC lobby.

49. Plaintiff and Haley Wickstrom got into a disagreement in the Outlook DTC lobby after Plaintiff raised concerns about illegal fees and billing practices.

50. Haley Wickstrom escalated the situation, raised her voice, directed staff to call police, and failed to de-escalate the interaction.

51. After the disagreement, an unknown male tour prospect stood up from the couch, placed his hands on Plaintiff, physically grabbed Plaintiff, and chased Plaintiff through the lobby area.

52. Plaintiff ran because she was frightened and did not know why an unknown male was putting his hands on her.

53. While fleeing, Plaintiff struck the door and sustained dental and facial injuries.

54. Haley Wickstrom stood by while the unknown male tour prospect physically grabbed Plaintiff and Plaintiff ran from the lobby.

55. Haley Wickstrom did not protect Plaintiff, did not stop the unknown male tour prospect, and did not prevent the physical escalation in the leasing office area.

56. Haley Wickstrom directed Peggy H. and/or other leasing staff to call the police on Plaintiff while Plaintiff was speaking about unlawful billing issues.

57. There was no life-threatening emergency requiring police involvement.

58. Calling police on Plaintiff under those circumstances was retaliatory and intimidating.

59. Plaintiff is a Black woman and was placed in danger by Defendants' unnecessary police escalation.

60. Haley Wickstrom used police escalation to silence Plaintiff's speech about unlawful billing practices.

## 8. HALEY WICKSTROM'S FALSE NARRATIVE AND DOOR SURVEILLANCE

61. Haley Wickstrom told law enforcement that Plaintiff fled the scene to avoid arrest.

62. That statement was false.

63. Plaintiff left Outlook DTC because Plaintiff sustained facial and dental trauma and needed emergency medical treatment.

64. Plaintiff's Uber receipt shows that Plaintiff was picked up at approximately 12:58 p.m., transported by UberX driver Scott, charged $20.95, traveled 6.16 miles, and arrived at approximately 1:14 p.m. at 14200 E. Arapahoe Rd., the hospital location.

65. Haley Wickstrom's statement to law enforcement helped create a false narrative that Plaintiff was avoiding law enforcement rather than seeking medical care.

66. Haley Wickstrom later claimed she feared Plaintiff and pursued or participated in a civil protection proceeding.

67. Haley Wickstrom's conduct contradicted that claim.

68. On July 8, 2026, July 9, 2026, July 15, 2026, and July 16, 2026, Haley Wickstrom repeatedly surveilled Plaintiff's apartment door and hallway area while Plaintiff was approximately 1,500 miles away from Denver, Colorado.

69. Plaintiff was not present at Outlook DTC during those dates.

70. Haley Wickstrom repeatedly walked near Plaintiff's apartment door, turned her head directly toward Plaintiff's door from only a few feet away, monitored papers left by sheriff's deputies, and watched whether anything at Plaintiff's door had been moved.

71. When Haley Wickstrom walked past Plaintiff's door, she turned her head directly toward Plaintiff's door from only a few feet away to get a clear look at the door, the area around the door, and the materials left there.

72. Haley Wickstrom's conduct was not normal hallway traffic or ordinary property-management movement.

73. Plaintiff's CCTV footage shows that other Outlook DTC employees regularly passed Plaintiff's door in the ordinary course of work without surveilling or monitoring the door.

74. Bryant F., the maintenance technician, passed Plaintiff's door frequently during the day. When Bryant F. passed Plaintiff's door, he was typically on the phone, looking down at his phone, or otherwise focused on his work.

75. Bryant F. did not stop, turn toward Plaintiff's door, or monitor the materials left at Plaintiff's door.

76. Peggy H. also passed through the hallway in the ordinary course of work and was shown minding her own business, including carrying boxes or performing ordinary hallway tasks.

77. Peggy H. did not engage in the same door-focused surveillance conduct.

78. Haley Wickstrom was the only employee shown repeatedly turning toward Plaintiff's door and monitoring the door area in that manner.

79. The difference between Haley Wickstrom's conduct and the conduct of Bryant F., Peggy H., and other staff shows that Haley Wickstrom's conduct was targeted surveillance, not routine property-management activity.

80. Haley Wickstrom's repeated surveillance of Plaintiff's door was retaliatory, intimidating, and connected to Plaintiff's housing disputes, complaints about illegal fees, and the civil protection matter Haley pursued without valid service on Plaintiff.

## 9. PEGGY H.'S CONDUCT

81. Defendant Peggy H. is a sales associate at Outlook DTC.

82. On July 2, 2026, Plaintiff came to the Outlook DTC leasing office to speak with management about illegal fees and billing practices.

83. Plaintiff spoke to a prospective resident in the lobby and warned him to carefully review his paperwork before signing a lease because Outlook DTC charged illegal fees.

84. Haley Wickstrom interrupted Plaintiff while Plaintiff was speaking about the illegal charges.

85. Haley Wickstrom directed Peggy H. to remove Plaintiff from the area and to call police.

86. Peggy H. acted at Haley Wickstrom's direction and attempted to move Plaintiff out of the leasing office area.

87. Plaintiff repeatedly told Peggy H. not to touch her.

88. Plaintiff stated words to the effect of: "Do not touch me. Please do not touch me. Do not put your hands on me."

89. Peggy H. continued participating in the attempt to remove Plaintiff from the lobby even though Plaintiff was speaking about billing issues and was not creating a life-threatening emergency.

90. During the same lobby incident, a male individual got up from the couch, placed his hands on Plaintiff, grabbed Plaintiff, and physically restrained or handled Plaintiff.

91. Peggy H. was present and observed the male individual grab Plaintiff.

92. Peggy H. did not intervene.

93. Peggy H. did not tell the male individual to stop.

94. Peggy H. did not call for help to protect Plaintiff.

95. Peggy H. did not take reasonable action to prevent the physical escalation inside the leasing office area.

96. Plaintiff ran because she was frightened and did not know why an unknown male was putting his hands on her.

97. Later on July 2, 2026, while Plaintiff was at the hospital receiving emergency medical care, Peggy H. went to Plaintiff's apartment door.

98. At approximately 2:23 p.m., Peggy H. appeared at Plaintiff's apartment door.

99. Peggy H. covered Plaintiff's surveillance camera with her hand.

100. Peggy H. called out to Plaintiff through the door, saying words to the effect of: "Are you inside? Are you in there? Are you OK? Are you alright?"

101. Plaintiff was not inside the apartment at that time.

102. Plaintiff was at the emergency room.

103. Plaintiff observed Peggy H.'s conduct through the surveillance camera.

104. Peggy H.'s conduct was not a good-faith welfare check because Peggy H. covered the camera and waited at the door while calling for Plaintiff.

105. Peggy H. left after realizing Plaintiff was not coming to the door.

106. Plaintiff later spoke with police by telephone at approximately 5:35 p.m., and police indicated that Peggy H. had been at Plaintiff's door because police were present.

107. Peggy H.'s conduct at Plaintiff's door was an attempt to lure Plaintiff out of the apartment while covering the camera and while Plaintiff was actually at the hospital.

108. Peggy H. engaged in lying-in-wait conduct at Plaintiff's apartment door.

109. Peggy H.'s conduct was deceptive, intimidating, and intended to lure Plaintiff to the door while concealing Peggy H.'s presence from the camera.

## 10. GRETA BIESEL'S CONDUCT

110. Defendant Greta Biesel is a sales associate at Outlook DTC.

111. On July 2, 2026, at approximately 12:30 p.m., Plaintiff called the Outlook DTC leasing office at 720-776-9523 to discuss illegal billing charges.

112. Greta Biesel answered the phone.

113. Plaintiff asked who she was speaking with, and Greta Biesel identified herself.

114. Plaintiff told Greta Biesel that Plaintiff wanted to talk about the illegal fees.

115. Greta Biesel refused to discuss the charges and told Plaintiff to speak with Haley Wickstrom.

116. Plaintiff stated that she would come downstairs and wait for Haley Wickstrom.

117. Greta Biesel told Plaintiff that Haley Wickstrom was not there.

118. Plaintiff immediately went downstairs from her apartment to the leasing office.

119. Plaintiff observed Haley Wickstrom present near the leasing office, contradicting Greta Biesel's statement.

120. Greta Biesel was seated at the table in the dark area of the leasing office.

121. Greta Biesel falsely told Plaintiff that Haley Wickstrom was not present and attempted to prevent Plaintiff from speaking with management about the illegal billing charges.

122. Later that same day, while Plaintiff was in the leasing office area, a grown man chased Plaintiff through the lobby at full speed.

123. Greta Biesel was present at the leasing desk and watched the incident.

124. Greta Biesel did not intervene.

125. Greta Biesel did not tell the man to stop.

126. Greta Biesel did not call for help to protect Plaintiff.

127. Greta Biesel did not take reasonable action to prevent or stop the physical escalation in the leasing office area.

128. Greta Biesel provided a written witness statement to law enforcement concerning the July 2, 2026 lobby incident.

129. In that written statement, Greta Biesel stated that Plaintiff got into a vehicle and fled the scene to avoid arrest.

130. That statement was false.

131. Plaintiff did not leave Outlook DTC to avoid arrest.

132. Plaintiff left Outlook DTC to obtain emergency medical treatment after sustaining facial and dental trauma during the lobby incident.

133. Plaintiff's July 2, 2026 Uber receipt establishes that Plaintiff was picked up at approximately 12:58 p.m., transported by UberX driver Scott, traveled 6.16 miles over approximately 16 minutes, paid $20.95 by Apple Pay Mastercard, and arrived at approximately 1:14 p.m. at 14200 E. Arapahoe Rd., the hospital location.

134. Greta Biesel's written statement to law enforcement falsely characterized Plaintiff's departure as flight from arrest rather than transportation for emergency medical treatment.

135. Greta Biesel's false statement to law enforcement furthered Defendants' retaliatory and intimidating conduct toward Plaintiff after Plaintiff challenged Defendants' illegal billing practices.

## 11. BRYANT F.'S CONDUCT

136. Defendant Bryant F. is a maintenance technician at Outlook DTC.

137. On July 2, 2026, at approximately 6:45 p.m., after the leasing office was closed, Plaintiff returned to Outlook DTC to retrieve her insurance card so she could obtain emergency dental treatment and travel for insurance-related dental services.

138. Plaintiff had hired a driver for transportation.

139. Plaintiff's driver was not involved in Plaintiff's dispute with Defendants and was present only to transport Plaintiff.

140. While Plaintiff was in the vehicle, the driver informed Plaintiff that Bryant F. had been behind the vehicle photographing the driver's license plate.

141. The driver rolled down the window and asked Bryant F. why he was taking pictures of the license plate.

142. Bryant F. laughed, smirked, and responded, "all is well," but refused to explain why he was photographing the license plate.

143. The incident occurred on Outlook DTC property in an area covered by Defendant's CCTV/security camera system.

144. Defendant possesses, controls, or has access to surveillance footage showing Bryant F. going behind Plaintiff's driver's vehicle after hours and photographing the license plate.

145. Bryant F.'s photographing of the driver's license plate served no legitimate maintenance purpose and was intimidating, retaliatory, and invasive.

146. The driver was a third party hired only to transport Plaintiff.

147. Bryant F.'s conduct expanded Defendants' surveillance and intimidation beyond Plaintiff and onto a third party assisting Plaintiff with transportation.

## 12. MEDICAL AND TRANSPORTATION EVIDENCE

148. During the July 2, 2026 lobby incident, an unknown male tour prospect stood up from the couch, placed his hands on Plaintiff, physically grabbed Plaintiff, and chased Plaintiff through the lobby area.

149. The unknown male was present for a leasing tour and had no lawful authority to detain, restrain, chase, or physically intervene with Plaintiff.

150. Outlook DTC leasing staff and management were present and did not stop the unknown male tour prospect.

151. Staff did not intervene, did not protect Plaintiff, did not direct the man to stop, and did not prevent the escalation.

152. Plaintiff ran because she was frightened and did not know why an unknown male was physically grabbing and chasing her.

153. While fleeing, Plaintiff struck the door and sustained dental and facial injuries.

154. Plaintiff's HCA medical/dental records identify the primary complaint as broken teeth from assault.

155. Plaintiff's HCA medical/dental records identify the secondary impression as facial trauma.

156. The medical records document Plaintiff's report that she was chased and cracked her teeth on the door while running from the man.

157. Plaintiff's July 2, 2026 Uber receipt identifies an UberX trip with driver Scott.

158. The Uber receipt shows Plaintiff was picked up at approximately 12:58 p.m. and arrived at approximately 1:14 p.m.

159. The Uber receipt shows a fare of $20.95, paid by Apple Pay Mastercard.

160. The Uber receipt shows a trip distance of 6.16 miles and a trip duration of approximately 16 minutes.

161. The Uber receipt shows that Plaintiff was transported to 14200 E. Arapahoe Rd., the hospital location.

162. Plaintiff was later picked up from the hospital at approximately 6:10 p.m.

163. Plaintiff made a stop at Outlook DTC at approximately 6:24 p.m. to retrieve her insurance card for emergency dental care and travel related to dental treatment.

164. Plaintiff was dropped off back at the hotel at approximately 6:42 p.m.

## 13. YARDI SYSTEMS, LLC / RENTCAFE CONDUCT

165. Defendant Yardi Systems, LLC, individually and d/b/a RentCafe, operated, controlled, maintained, or provided the RentCafe resident portal/payment platform used by The Connor Group LLC and Outlook DTC for resident payments, ledgers, account access, payment history, billing records, portal access, and resident-service functions.

166. Plaintiff made payments through RentCafe and was the user/cardholder connected to the payment history.

167. In May 2026, after being locked out of her resident portal and unable to view her payment history, account ledger, or charges, Plaintiff contacted Yardi/RentCafe by phone.

168. Plaintiff requested access to her own payment history and account records.

169. Plaintiff told Yardi/RentCafe that she was dealing with landlord retaliation and that her landlord/property manager was refusing to let her see whether they were adding, removing, altering, or changing items on her account.

170. Plaintiff did not ask for The Connor Group's proprietary information or the landlord's private information.

171. Plaintiff requested her own payment history and account information.

172. Yardi/RentCafe refused to provide Plaintiff access to her own payment history and account records.

173. Yardi/RentCafe told Plaintiff to contact the property management company.

174. Yardi/RentCafe directed Plaintiff back to the same landlord and property manager that Plaintiff had identified as retaliating against her and blocking her access.

175. Yardi/RentCafe's refusal left Plaintiff unable to independently verify her own payments, ledger history, and account records.

176. Yardi/RentCafe's platform and refusal to provide user/payment records enabled and substantially assisted the denial of Plaintiff's access to her own housing-related account information.

### 14. RACE, POLICE THREATS, AND FORESEEABLE RISK OF LETHAL FORCE

177. Plaintiff is a Black woman.

178. Defendants Haley Wickstrom, Peggy H., Greta Biesel, and Bryant F. threatened or used police involvement against Plaintiff and created a racially hostile and dangerous housing environment.

179. On July 2, 2026, Plaintiff was in the Outlook DTC lobby asking about illegal fees and billing issues.

180. Plaintiff was not creating a life-threatening emergency.

181. Plaintiff was not threatening anyone.

182. Plaintiff was speaking about Defendant's billing practices.

183. While Plaintiff was speaking about illegal fees, Outlook DTC staff told others to call the police on Plaintiff.

184. Plaintiff is a 26-year-old Black woman, and Defendants' willingness to use police threats and false narratives against her created a foreseeable risk of severe harm.

185. A false police report describing Plaintiff as armed, dangerous, or threatening would create a foreseeable risk that law enforcement would respond with force, including lethal force.

186. Defendants' conduct placed Plaintiff in serious danger because staff had already threatened police involvement while Plaintiff was merely speaking about illegal fees.

187. Defendants' police threats, false narratives, and willingness to involve police against Plaintiff created a racially hostile and dangerous housing environment and interfered with Plaintiff's ability to safely live at Outlook DTC.

188. The Connor Group LLC is on notice that its employees' false police calls, false weapon allegations, or false danger reports about Plaintiff create a foreseeable risk of severe physical harm or death.

189. Defendants are responsible for preventing their employees from making false police calls, false weapon allegations, or false danger reports about Plaintiff.

## 15. CONCERTED ACTION BY HALEY, PEGGY, GRETA, AND BRYANT

190. Defendants Greta Biesel, Bryant F., and Peggy H. acted in concert with Haley Wickstrom and followed Haley Wickstrom's directives even when those directives violated Plaintiff's fair housing rights, safety, and access to housing services.

191. Greta Biesel, Bryant F., and Peggy H. were not neutral bystanders.

192. They participated in, assisted, or carried out Haley Wickstrom's retaliatory conduct against Plaintiff.

193. Greta Biesel, Bryant F., and Peggy H. knew or had reason to know that the conduct directed at Plaintiff was improper, retaliatory, and discriminatory, but they followed Haley Wickstrom's directions anyway.

194. Their conduct helped create a hostile and dangerous housing environment for Plaintiff and furthered the retaliation against Plaintiff for speaking about illegal fees, disability-related housing issues, and landlord misconduct.

195. The Connor Group LLC is responsible for the conduct of Haley Wickstrom, Greta Biesel, Bryant F., and Peggy H. because they acted as employees, agents, and representatives of Outlook DTC and The Connor Group LLC while performing housing-related duties on the property.

196. Their conduct was coordinated, intentional, and part of a pattern of retaliation, intimidation, and interference with Plaintiff's fair housing rights.

## 16. PRESERVATION OF EVIDENCE

197. Defendants possess, control, or have access to evidence relevant to this action.

198. Plaintiff requests preservation and production of all CCTV/security footage showing the leasing office, lobby, hallways, Plaintiff's apartment door, the parking lot, building entrances, vehicle areas, and employee movements on July 2, July 8, July 9, July 15, and July 16, 2026.

199. Plaintiff requests preservation and production of all footage showing Haley Wickstrom, Peggy H., Greta Biesel, Bryant F., maintenance staff, leasing staff, and any other Outlook DTC employees involved in the events described in this Complaint.

200. Plaintiff requests preservation and production of all CCTV/security footage from Outlook DTC showing the parking lot, leasing office exterior, building entrances, and vehicle areas on July 2, 2026, from at least 6:00 p.m. to 7:30 p.m.

201. Defendant's surveillance footage will show Bryant F. going behind Plaintiff's driver's vehicle and photographing the license plate after the leasing office was closed.

202. Plaintiff requests preservation and production of all RentCafe/Yardi records, portal lockout records, audit logs, metadata, charge-code history, payment history, access logs, user logs, account notes, and communications concerning Plaintiff's account.

203. Plaintiff requests preservation and production of employee communications, internal notes, incident records, tour scheduling records, visitor logs, leasing office records, and records identifying the unknown male tour prospect involved in the July 2 lobby incident.

## 17. CLAIMS FOR RELIEF

### COUNT I — FAIR HOUSING ACT RACE DISCRIMINATION / HOSTILE HOUSING ENVIRONMENT, 42 U.S.C. § 3604(B)

204. Plaintiff incorporates all prior paragraphs as if fully set forth here.

205. Plaintiff is a Black woman.

206. Defendants created a racially hostile and dangerous housing environment through police threats, false narratives, targeted surveillance, intimidation, retaliatory treatment, and conduct creating a foreseeable risk of severe harm from false police involvement.

207. Defendants' conduct interfered with Plaintiff's equal terms, conditions, privileges, services, and facilities connected with rental housing.

208. Defendants violated 42 U.S.C. § 3604(b).

### COUNT II — FAIR HOUSING ACT DISABILITY DISCRIMINATION / DENIAL OF EQUAL HOUSING SERVICES, 42 U.S.C. § 3604(F)

209. Plaintiff incorporates all prior paragraphs as if fully set forth here.

210. Plaintiff is disabled.

211. Defendants had notice of Plaintiff's disability status.

212. Defendants denied, interfered with, or burdened Plaintiff's access to housing-related services, resident portal functions, maintenance access, account information, and safe use of the premises.

213. Defendants' conduct denied Plaintiff equal access to housing-related services and facilities.

214. Defendants violated 42 U.S.C. § 3604(f).

### COUNT III — FAIR HOUSING ACT RETALIATION, COERCION, INTIMIDATION, AND INTERFERENCE, 42 U.S.C. § 3617

215. Plaintiff incorporates all prior paragraphs as if fully set forth here.

216. Plaintiff exercised housing rights and complained about illegal fees, housing-related misconduct, disability-related issues, portal lockout, and landlord retaliation.

217. Plaintiff contacted HUD/FHEO concerning housing-related discrimination and retaliation.

218. Defendants retaliated, intimidated, surveilled, threatened police involvement, denied access to records, created false narratives, failed to intervene, and interfered with Plaintiff's housing rights.

219. Defendants violated 42 U.S.C. § 3617.

## COUNT IV — COLORADO PREMISES LIABILITY / FAILURE TO PROTECT, C.R.S. § 13-21-115

220. Plaintiff incorporates all prior paragraphs as if fully set forth here.

221. The Connor Group LLC controlled the Outlook DTC premises, including the leasing office, lobby, hallways, and parking areas.

222. Plaintiff was lawfully on the property.

223. Defendants failed to protect Plaintiff from a dangerous condition and unsafe conduct occurring on the premises.

224. Defendants failed to intervene when the unknown male tour prospect grabbed and chased Plaintiff through the lobby.

225. Plaintiff sustained dental and facial injuries.

226. The Connor Group LLC is liable under the Colorado Premises Liability Act, C.R.S. § 13-21-115.

## COUNT V — CORPORATE NEGLIGENCE / NEGLIGENT SUPERVISION AND TRAINING

227. Plaintiff incorporates all prior paragraphs as if fully set forth here.

228. The Connor Group LLC owed duties to train, supervise, and control its employees and agents.

229. The Connor Group LLC failed to prevent, correct, supervise, or stop retaliatory, intimidating, unsafe, and discriminatory conduct by its employees.

230. The Connor Group LLC failed to ensure that employees protected residents, de-escalated conflict, refrained from false police narratives, and complied with fair housing obligations.

231. Plaintiff suffered damages as a result.

## COUNT VI — NEGLIGENCE / FAILURE TO INTERVENE

232. Plaintiff incorporates all prior paragraphs as if fully set forth here.

233. Defendants Haley Wickstrom, Peggy H., Greta Biesel, and The Connor Group LLC had duties to act reasonably and protect residents from foreseeable harm in the leasing office/lobby area.

234. Those defendants failed to intervene when Plaintiff was physically grabbed and chased.

235. Plaintiff suffered facial and dental injury.

## COUNT VII — FALSE STATEMENTS TO LAW ENFORCEMENT

236. Plaintiff incorporates all prior paragraphs as if fully set forth here.

237. Greta Biesel and Haley Wickstrom gave false statements or false narratives to law enforcement claiming Plaintiff fled to avoid arrest.

238. Plaintiff left to obtain emergency medical treatment.

239. The false statements furthered Defendants' retaliatory and intimidating conduct.

## COUNT VIII — CIVIL CONSPIRACY / CONCERTED ACTION

240. Plaintiff incorporates all prior paragraphs as if fully set forth here.

241. Defendants acted together to retaliate against, intimidate, surveil, and interfere with Plaintiff.

242. Each defendant performed different acts in furtherance of the same retaliatory and discriminatory pattern.

243. Defendants' coordinated conduct caused damages to Plaintiff.

## COUNT IX — RETALIATORY SURVEILLANCE / INTIMIDATION

244. Plaintiff incorporates all prior paragraphs as if fully set forth here.

245. Haley Wickstrom surveilled Plaintiff's apartment door and hallway area.

246. Bryant F. photographed the license plate of Plaintiff's driver after hours.

247. Peggy H. covered Plaintiff's door camera and attempted to lure Plaintiff out.

248. Defendants' surveillance and intimidation interfered with Plaintiff's housing rights and safety.

## COUNT X — YARDI/RENTCAFE INTERFERENCE / DENIAL OF USER PAYMENT RECORDS

249. Plaintiff incorporates all prior paragraphs as if fully set forth here.

250. Yardi/RentCafe operated or provided the platform through which Plaintiff's resident payments, ledger, portal access, and payment history were maintained.

251. Plaintiff contacted Yardi/RentCafe in May 2026 and requested her own payment history and account records.

252. Plaintiff told Yardi/RentCafe that she was dealing with landlord retaliation and that her landlord was blocking access.

253. Yardi/RentCafe refused to provide Plaintiff access to her own payment history and account records and referred Plaintiff back to the same landlord Plaintiff identified as retaliating against her.

254. Yardi/RentCafe's refusal interfered with Plaintiff's ability to access her own housing-related payment and account information.

## COUNT XI — INJUNCTIVE RELIEF AND PRESERVATION OF EVIDENCE

255. Plaintiff incorporates all prior paragraphs as if fully set forth here.

256. Plaintiff seeks orders requiring Defendants to preserve and produce CCTV footage, RentCafe/Yardi records, portal logs, employee communications, incident records, tour records, witness statements held by Defendants, medical-related incident records, and all evidence described in this Complaint.

257. Plaintiff seeks injunctive relief preventing further retaliation, surveillance, police threats, false reports, and denial of housing-related services.

## 18. DAMAGES

258.  Plaintiff seeks damages in the amount of $20,000,000.00, or such amount as a jury determines.

259.  Plaintiff seeks compensatory damages, physical injury damages, dental injury damages, emotional distress damages, housing-related damages, statutory damages, punitive damages where authorized, costs, interest, attorney fees where authorized, injunctive relief, and all other relief allowed by law.

## 19. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants and award:

A.  Damages in the amount of $20,000,000.00, or such amount as a jury determines;

B.  Compensatory damages;

C.  Punitive damages where authorized;

D.  Statutory damages;

E.  Injunctive relief prohibiting further retaliation, intimidation, surveillance, false police reports, and interference with Plaintiff's housing rights;

F.  Preservation and production of CCTV footage, RentCafe/Yardi records, portal logs, employee communications, incident records, and all relevant evidence;

G.  Costs of suit;

H.  Attorney fees where authorized;

I.  Prejudgment and post-judgment interest; and

J.  Such other and further relief as the Court deems just and proper.

## 20. JURY DEMAND

260.  Plaintiff demands a trial by jury on all claims and issues so triable.


Respectfully submitted this __17__ day of __July_____, 2026.


**JANE DOE**
Plaintiff, Pro Se